First case for argument this morning is 17-1070, Honeywell International v. FujiFilm. You're splitting the time, so is it Mr. Siegel? Mr. Kornitsky, I'll be taking ten minutes in the opening, and then Fuji's counsel, Mr. Siegel, will take three. In the opening, not as a rebuttal. In the opening, correct, and I'll reserve two minutes for rebuttal, if that's okay. Okay, fine. Please proceed. Good morning, Your Honor. There's really one primary question in this appeal, and that's whether the district court abused its discretion in failing to find the case exceptional. And it's the appellant's position that this case stands out from others, and that Judge Stark abused his discretion in concluding this was an ordinary case. Well, I was going to ask for particulars, because he went into a good deal of objective analysis as to why he reached the conclusion that he did. So is there anything in particular you can point to, or is it just a conclusion? Yes, Your Honor. What he did, he said, he certainly said he reviewed the totality of the circumstances, but in fact what he did is go through the facts and look for a culpable basis to support Honeywell's position. But what he failed to do was to look at the facts that Judge Farnan had relied on, Volumes 3 and Volumes 4, and the explicit testimony of the inventors and a Rule 30b-6 witness. Is this the distinction between culpable and reasonable that you want us to draw? Yes, Your Honor. The objective reasonableness test is supposed to be giving substantial weight. There's a significant difference between looking at something that's objective, the objective arguments that are being made, and the culpable or subjective good faith belief. And if you look at the facts in this case objectively, there are two things we need to establish. The first, though, the three things that we needed to establish. The first was ready for patent. He had already been conceded with Honeywell's argument of reduction to practice. The only two things that we had to prove was that there was a commercial offer for sale, and that what was in that commercial offer for sale was a two-lens array, the invention. This is Volume 4. Okay, Volume 4 is what the Judge Deshfarnon relied on to find a commercial offer for sale. It's a hundred and- That's- Yeah, this starts at Appendix- I had visions of some big fat compilation of pricing and so on. No, this starts at Appendix 11723. Oh, okay. And this is a 125-page document written by Honeywell. Okay, the title that Honeywell gave to the document is Volume 4, Price Offering and Contractual Terms and Conditions. But it included prices in terms for some eventualities that were not, at least according to the briefs covered by the claims, so that here in their argument, position, that this was a project still in development and it wasn't that clear what was going to be the eventually sold, ordered product. Is that a fair statement? I'd say that it's not a fair statement. The contract or the airplanes and parts may still have been in development, but there's no question that this document constituted a commercial offer. Okay, on Section 1, Page 1, it says, The price offering and contractual terms and condition is submitted by Honeywell in response to Boeing's request for proposal. This complete proposal is provided at no cost. Firm fixed prices are provided in Section 2. But it was an offering, and this is where I had my problem. I'm sorry. An offering of alternatives that it wasn't saying this is what we're negotiating to buy and sell. Well, Volume 4. Possibilities included within Volume 4. Yeah, Volume 4 itself is the commercial offer for sale. If you want to go to what was being offered, that would go to Volume 3. What Judge Farnon relied on for what was in the Ames proposal, he relied on Volume 3, which identifies a two-lens array, refers to display units like Number 9, and then he looks at all of the documents and testimony from the inventors. For example, all of the documents that he relied on and cites in his decision refer to the inventors congratulating each other on solving the problem using the two-lens array. Quickly send this to the manufacturer and get these three display units built with the two-lens array, and we're going to send these to Boeing. Then in Volume 3, it refers to a directional diffuser with a horizontal and vertical component, which can only be accomplished with a two-lens array. It expressly offered a directional display like DU Number 9, and there's no dispute that DU Number 9 has a two-lens array. It's referred to as a deliverable by August 1990, and Judge Farnon concluded that all the inventors, all the technical people, knew exactly what was being offered. It was untenable to argue that the two-lens array wasn't being offered. So what does Honeywell argue? Honeywell first argues that the two-lens array wasn't offered at all. And then when you look at the language in all of the documents that were going back and forth between the inventors, the fact that inventor McCartney wrote the directional diffuser section and the reference to specifically display unit number 9, which had the two-lens array, it was untenable to argue. Your argument sounds as if you're asking us to look at all the facts and decide to no-go whether this case was exceptional. And don't we have to look at whether Judge Stark abused his discretion? That's correct, Your Honor, and it's our position that when you look at these documents, again, Judge Farnon's conclusion that it was untenable, display unit number 2 was not offered and that, in fact, it was offered. And then when you look at the language of the commercial proposal, this is probably the most detailed and complete offer of sale that's ever been contested. What's your basis for saying that Judge Stark did not look at the materials that you're presenting to us right now? My Judge Stark states that, I recognize, of course, that Judge Farnon made a statement to the effect that Honeywell knew it had made an offer for sale, but this is not, in the Court's view, the same as a finding that there was no reasonable basis at any point pre-litigation or during the litigation for Honeywell and or its attorneys to believe to the contrary. It's our position that if you have knowledge of a commercial offer for sale, then there is no reasonable basis to argue against the specific document and the Rule 30b-6 witness who was designated by Honeywell to testify about the Inn's proposal, Darcelle Aioli. And she testified that it was, in fact, an offer and, in fact, Honeywell wanted Boeing to accept it. So between the actual document, which identifies display unit number 9 with the two lens array, the language of the offer, the Rule 30b-6 witness... And the other element of the on-sell bar that you were talking about was whether the commercial embodiment had all the limitations of the claim. Correct. And that was undisputed, Your Honor. That was undisputed? Correct. They had reduced... On summary judgment, there was no dispute at all? Well, they had argued that the invention had been reduced to practice. So there was no dispute as that when we were talking about the two lens array, that that was, in fact, the claimed invention. So ready for patenting, reduction to practice were undisputed. And that this was covered in display unit number 9 is also the court found it was untenable to argue otherwise. Which court found that it was untenable to argue otherwise? Judge Fornan. Well, Judge Fornan's statements that you cite where he uses the word knew twice, they weren't in his section that addressed whether there was a commercial offer. And he never sort of made a legal conclusion on the commercial offer that says that they knew at all times that this offer qualified legally as a commercial offer for on sale. It seems to me his findings that you're pointing to are a little less conclusory or final than one might expect, than you portray. Your Honor, I would submit that when you look at this document, Volume 4, it's incontestable that this was, in fact, a commercial offer. And it's incomprehensible that you could find that it's not. What Judge Fornan said was that... It is clear from the evidence as set forth by the court above that Honeywell knew that the double lens array was the assembly that provided the best results. That these double lens embodiments were offered to Boeing and testified by Boeing, etc., etc., right? That's what he said. Correct. And he also went on to say that it's clear from the evidence that we have a definite offer capable of acceptance in the contract sense and such offers have always been sufficient to invoke the on-sale bar. The fact that you have Honeywell's own Rule 30b-6 witness saying this is a commercial offer, the fact that the document itself is called Price Offering Contractual Terms and Conditions, sets forth a price, sets forth deliverables, sets forth an FOB in Phoenix, Arizona, has a billing schedule, talks about deliverables and invoices. There's just no way that anyone could argue that they didn't know this was a commercial offer, Your Honor. Okay. Your time is up, so I'm going to hear from your colleague. Thank you. Good morning, Your Honors. Matthew Siegel. If patent litigations like this one are becoming quite ordinary, then I really think the Federal Circuit ought to do something about it because an affirmance here would be saying that it's okay for a patent attorney to ignore evidence, clear evidence of an on-sale bar or invalidity before filing the patent application. It's okay. So you're talking about the non-inequitable conduct assertion here, right? The concern I have about this case and others is something that I think former Judge Sue Robinson said in an opinion once, is we're getting a case on summary judgment or whatever, and in order to overturn a district court judge on an abuse of discretion, we have to relitigate all of the facts and understand the record. Now, you all had an opportunity to assert an inequitable conduct. We had the opportunity after summary judgment was granted to have a full-blown trial on every single issue, and we offered to have just a hearing on the inequitable conduct. We couldn't come to an agreement on that. So I would submit that it would have been a terrible waste of judicial resources to have a full-blown hearing on all the issues that had already been decided on summary judgment. But now you want us as an appellate body to do fact-finding and reach conclusions with regard to allegations that the court didn't opine on because you all decided not to press forward on your inequitable conduct. We're not asking for a finding of inequitable conduct. What we're saying is that when an attorney has a three-year-old file, when he knows that the invention was developed for the purpose of selling the product, when he considers for himself, he admits he thought about, well, is this an on-sale bar, and then doesn't do any investigation at all, that that's extraordinary. We're not saying that it was inequitable conduct. It doesn't matter if it was inequitable conduct. We're saying that that was extraordinary. We're saying that when you bring a lawsuit over a product that you know was developed with the intent to sell it, when pre-suit you collect a document that identifies volume 4, price offering, contractual terms and conditions, but you don't look at those documents and bring the lawsuit anyway without doing any kind of a validity investigation, that that's exceptional conduct. And that also when you start a lawsuit and abuse the discovery process to hide that evidence of invalidity, that that's exceptional conduct. They did a pre-suit collection, and then we specifically asked them for volume 4. They never went back to Honeywell documents. They never went back to Honeywell files and searched for volume 4. They searched. Well, the record says they searched. Well, no, the record says we searched what we had already collected. They searched where they knew it wouldn't be, the pre-suit collection, where the collector says if I had come across volume 4, I would not have pulled it. I think so. I think it says, I think they said they searched and couldn't find him. They searched the documents that they had already collected pre-suit and documents of ex-employees who couldn't possibly have it. If you look at the correspondence I submitted, it's very clear that no one at Honeywell ever testified that they searched documents. In fact, it's the opposite. Mr. Luther, the 30B6 witness and document collection, said no one asked me to search for it. Thank you. Good morning. May it please the Court. I'll just start with that last point to tie it up. Your Honor, the reference to where we searched is at Appendix 231, pages 90 to 91, and that was Mr. Woods' statement to the Court the first time we had a hearing on this issue before the Court in, I believe, 2012 or 2013. And the reference to Mr. Luther's testimony, that testimony was in June of 2007. The letters that counsel was referring to took place after that in July and August, and the search that Mr. Woods was referring to took place after Mr. Luther's deposition. But you had access to Volume 3 all the time. We did. And Volume 3 makes reference to Volume 4, right? It does. Okay. Did you ever request Volume 4 from Boeing? I mean, you know some volume existed if you didn't have it or you didn't have easy access to it. Did you go to Boeing and say, do you have it? We did not. Why not? Well, we looked. They asked for it from us. We looked. We didn't have it. Nearly simultaneously, they were asking for it from Boeing, and we were in communication with Boeing. Boeing said they had it and that they were going to produce it. Prior to that time, we didn't. Wasn't there some delay in getting it? Only a delay. This whole Volume 4 issue took place over a matter of a couple of months, and Boeing produced the Volume 4, I believe, in September. But Boeing wasn't a party to this lawsuit, right? That's correct. So when the other side asks you for information and you have knowledge of it and you have the ability to get it, why does that? And so your answer to the fact that you didn't produce it is that you knew they had asked Boeing for it and they were going to get it anyway? Well, my answer to that question is, Your Honor, that we did not have it, and we were being asked for many, many documents. We didn't go to Boeing. We learned relatively quickly that they had subpoenaed Boeing and that Boeing was going to produce it. When you look at the sequence of events, Boeing produced this in about September of 2007. It was two years after that before the motion for summary judgment for on-sale bar was brought. And the on-sale bar issue was already in the case through OPTREX's answers to contention interrogatories. And your evidence that you had some reasonable belief that there was no commercial offer for sale is? Well, two things, Your Honor. First, there was no commercial offer for sale that had the power of acceptance. I'll go into that in a moment, and I'll show some of the objective evidence that we relied on in our argument and also the court relied on. But secondly, we do not believe that that two-lens array was ever presented to Boeing prior to the critical date of the invention. And I can show you, Your Honor, evidence of that as well. But if we just step back and look at what this contract was, they were going to create an entirely new cockpit for the Boeing 777 aircraft. And this specific piece of technology that they were looking at, one of the aims of this contract was to reduce the number of pilots in the cockpit from three to two. And this flat panel display was going to sit between the two pilots so that the captain on the left could see the display and the first officer on the right could see the display and it would have equal clarity and resolution for both. And what Honeywell was doing here with these display units was trying to find a way to achieve that. Now ultimately, none of this technology is what ended up in the cockpit. There was no directional diffuser. But where we believe, and what our theory of the case was, was that these were given to Boeing so that Boeing and Honeywell engineers could evaluate whether this technology would actually work. And yes, there was this overarching contract in Volumes 3 and Volumes 4, but the specific technologies that would be a part of it had to be developed as part of this new cockpit. So the evidence that the, and the district court used the word reasonable basis at several points in the opinion, and this is one of them where the district court looked specifically at this evidence. And I would point the court to a couple of places, not to belabor it because this has been litigated several times, but at Appendix 1, 2, 9, 5, 8, and 5, 9, we have the technical coordination meeting minutes of number 93. These were produced after the critical date of the patent. And this is where the two lens array was submitted to Boeing. And we submitted a single lens array, a double lens array, and a triple lens array. And if we look specifically at that page, what those technical coordination meeting minutes say is they are there for evaluation by the Boeing and Honeywell engineers. Then we have at Appendix 1, 1, 9, 8, 4, that these units were consigned to Boeing, not delivered, doesn't say not delivered for sale, it says consigned, but a consignment is a transaction where you give something to someone. But let me ask you, it's a little, because you're arguing as if there were numerous factual disputes about what happened or what this document said, and at the end of the day, you lost on summary judgment, right? That's correct. The judge concluded that no reasonable person could conclude that you were right, and that there was no material factual dispute. He concluded that, and we came to appeal before Your Honor. But, you know, we continue to believe we were right. We're not relitigating the issue. But the simple fact that we lost on summary judgment does not convert a case to an exceptional case. You know, we disagreed with Judge Farnan. We disagreed with the panel based on this evidence. The real point here is, is the case exceptional under Octane and Highmark? Is it the real question whether the court below used its discretion in making that determination? Yes, on the issue of exceptional case it is. And I believe, and I was referring to his initial finding in his order that is before the court. He reviewed this evidence and found that we had a colorable, reasonable basis to assert the argument that we had. And, therefore, that particular position did not make the case exceptional. And if we continue from that, Judge Stark reviewed, you know, he had before him 8,000 pages of record. He had a hundred and some attachments. He heard nearly five hours of argument in two hearings. He asked all of the counsel for the litigants difficult questions. And I think if the court simply tracks through his order at Appendix 20 through 2 through 24, when we were before the court the first time on the exceptional case issue, the court, in the intervening time between his first order and the second order, the Supreme Court came out with its Octane thickness decision. And this court sent it back specifically to reevaluate the case in accordance with the standards set forth in Highmark and Octane fitness. And if we look at Appendix page 22, at transcript page 71, starting at line 14, Judge Stark makes reference to this. And he says specifically, in the remand opinion, the federal circuit said, we vacate the district court's decision on this issue in remand for further consideration of whether the case should be deemed exceptional under 35 U.S.C. Section 285 in light of the Supreme Court's guidance from Highmark and Octane thickness. And that is precisely what I have done. And then he goes on to look at and takes out the very plain statement that the Supreme Court made. An exceptional case is simply one that stands out from the rest. And he concludes, after noting that it's important to guard against the application of hindsight, that this was really a quite ordinary, complex, hard-fought, high-stakes piece of litigation. And later, in his opinion, says it's very typical of the type of litigation we see in this district and one that does not stand out. One comment that Judge Stark also made was he said, and noteworthy here, of course, is that patents are presumed to be valid and plaintiff and their counsel were allowed to rely on the presumption of validity. Of course, he's right about the presumption of validity. But if that were a noteworthy factor in every exceptional case, then it seems like the scales are strongly tipped in the patent owner's favor because, obviously, there's a presumption of validity for every issued patent. So to what extent does that factor appropriately play a role in this determination? Well, I think that ultimate question is one for the court. It has its nautilus and its cue pharma decisions that say that. But here, there is much more on the pre-suit investigation. And Judge Stark specifically found that there was no evidence that we'd failed to make an adequate investigation on either invalidity or infringement. And I'll just go into some of that. It was acknowledged that pre-suit we hired all three inventors and the prosecuting attorney. If the court looks to the substantive evidence that was produced, the 1989 invention disclosure statement shows that they did not believe this to be an offer for sale. In fact, the prosecuting attorney testified in his deposition that he analyzed it and did not believe it was an offer for sale. That went unchallenged. There was no follow-up. We had all of the evidence that I've already discussed about our theory of the case. That went to validity. On infringement, we tore down literally hundreds of these devices. And the complaint they made on our infringement analysis is that we did not test for elimination of moiré effect, but that was not an express limitation of the claim. And so based on that evidence, Judge Stark found that there was no failure to make an adequate investigation before the suit was brought. Now, he also said we could have done more. We acknowledge that. You can always do more. But what we did was adequate, and it didn't rely and depend simply upon the presumption of validity. Now, I'll simply — I'm not going to belabor it any longer. I'll simply direct the Court to the final portion of Judge Stark's order on page 80 of hindsight in evaluating this evidence. He considered every single one of the arguments that have been made throughout the seven years that this issue has been alive, and he found that this is a complex, multifaceted, ordinary case, and the arguments don't transform it into one that is simple and exceptional. And I'll simply note that this comes from a court and a district that sees a lot of this, and if the Court were to look at Judge Stark's opinions, he has found exceptional cases in some situations and not in others. Can I ask you, your friend talked about, and you're kind of reaching to now, the district court's determination that the Supreme Court called out whether this — I don't know the quote — whether this stands out from others, whether — do you know the quote from the Supreme Court opinion? Whether this case — I believe — I don't have it written down, but I believe it's — I believe what the Supreme Court said was an exceptional case is simply one that stands out from others. I think it's from the rest. From the rest. I'm sorry. All right. Well, your friend noted that it would be unfortunate if we were to conclude that this is not the kind of case that stands out from the rest. How — leaving that aside for a moment — how are we supposed to, on appellate review, with an abuse of discretion review standard, how do you think we evaluate whether or not — the question of whether or not this appropriately stands out for the rest of the cases? Are we supposed to look at our experience in the cases we've seen? Are we supposed to try to put ourselves in the shoes of Judge Stark in the District of Delaware? How do you think we should review that issue? I think — I understand your question, and I think it's an excellent one. I think the way you do it, at least insofar as this case, and then in others it may be more difficult, but you look at what the judge considered. You look at did the judge take the — the remand statement, which this Court made in its remand, and apply it. You can look here at three pages of Judge Stark discussing the elements of octane fitness, and then going through and track through his order where he applied each of those statements of standard. He made the determination. I think you look at did the Court appropriately determine and apply the burden of proof. Judge Stark here made a clear distinction between the clear and convincing evidence that applied in Brooks Furniture and the preponderance. And then look for evidence in the Court's analysis. Did the Court actually consider the evidence that was presented? He took each of the issues in turn. You can even look back farther in the transcript and see where the judge asked difficult questions of both sides in his evaluation of the evidence. And in my view, you conclude there is no abuse of discretion based upon the quality and clarity of the analysis presented, because with 8,000 pages of record and hundreds of attachments and hours of argument, I don't see any other way for an appellate court to get visibility into that. Thank you. Thank you. Your Honor, I'd like to start with the question that you just asked. Because the 8,000 pages is not what's at issue. It's these two documents, the Ames proposal, which set forth the commercial offer and what was being offered. You asked, how does the Court look at this? And how do you decide whether it's an abuse of discretion? And I'd like to point the Court to Kurt Tsang, a Supreme Court case that instructs us that it sets forth the due process requirement that like cases should be treated alike as a restraint on a district court's discretion to deny fees. And so between Fuji and Samsung, we identified, I think, a dozen cases where there was pre-suit knowledge of the on-sale bar and a reduction to practice. And in every one of those cases, the courts awarded fees. And I think this case falls within those cases, number one. Number two, the idea about the presumption of validity and relying on that for a pre-suit investigation. The presumption of validity says that, you know, presumes that the examiner had an opportunity to review the information, prior art or whatever. In this particular case, the examiner never reviewed the on-sale bar. Yet the real testimony of the Jepson, the patent attorney, he said, I suspected there was an on-sale bar problem because his file was three years old. But he also said he did not do an investigation. He said, I didn't investigate it and I didn't talk to anybody. Then he said, I just concluded that there was an on-sale bar. But then counsel objected based on attorney-client privilege going any further into that issue.  And then what did Judge Stark do? I think it was clearly erroneous for him to conclude that Honeywell relied on an opinion of counsel. That was something he came up with on his own, and Honeywell never presented that argument anywhere, anytime. So that was clear error. The second point I'd like to address are the arguments of all of these documents that were brought up, whether it was the reduction to practice documents, the consignment documents, or the statement of work documents, those are not the Ames proposal, which is what we keep arguing. You can come up with a million documents that don't show an offer for sale. But this case, the octane court was looking for how do you define exceptional? And they used words like not common, unusual, rare. The fact that a company like Honeywell says, I didn't have the smoking gun document, and even if I did, I wouldn't understand this to be a commercial offer, that's unusual, that's rare, and that's not common. And then for Mr. Lewick to say that, well, Honeywell didn't produce it because Boeing was going to produce it. Honeywell, the Stacey Olberts letter said, so there, we know you tried to get the document from Boeing, and they didn't have it. I trust we're not going to hear from you about this issue anymore. Well, lo and behold, they ultimately did produce it. They, meaning Boeing, produced it. And Honeywell had tried to slow that production down when it said, hey, before you produce this to the defendant, send it to us first. So, again, this is a document that Honeywell wrote. This is a document that they undisputedly presented to Boeing. They represented and request for admissions that this doesn't exist, there's no evidence it exists, even though it's cited in volume three. Okay? They testified before Judge Stark at the last hearing, and he specifically asked, finally, yeah, but did Honeywell's employees search for the document? Can you tell me that Honeywell, not the lawyers, that Honeywell searched for the document? And Mr. Lewick testified that, no, he actually can't tell us one way or the other if Honeywell looked for it. Okay. Thank you, Your Honor. We thank both parties and the case is submitted.